IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-01602-MEH

JEFFREY D. SHERMAN,

     Plaintiff,

v.

MOTOROLA SOLUTIONS, INC.,

     Defendant.

---

# ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

Plaintiff Jeffrey Sherman ("Sherman") initiated this action on June 23, 2016 alleging generally that Defendant Motorola Solutions, Inc. ("Motorola"), his former employer, subjected him to discrimination and retaliation based on his age in violation of the Age Discrimination in Employment Act ("ADEA") and the Colorado Anti-Discrimination Act ("CADA"). Motorola filed an Answer in response to the Complaint and the case proceeded to discovery.

Motorola timely filed a motion for summary judgment arguing Sherman fails to demonstrate material factual issues concerning whether he was constructively discharged; whether Sherman's complaint of discrimination caused his placement on a performance improvement plan; and whether Sherman can show his age was a factor in any failure to promote. Sherman responded that (1) the evidence demonstrates he suffered intolerable conditions at work; (2) while Motorola may have determined before his discrimination complaint to place Sherman on a PIP, it made the PIP tasks more difficult to achieve after the complaint; and (3) he was not promoted despite his qualifications, but younger, less qualified employees were promoted. Motorola replies that Sherman failed to raise

genuine disputes with the evidence it has presented and/or ignored certain evidence altogether and, thus, Motorola is entitled to summary judgment on Sherman's discrimination and retaliation claims.

Nine days after Motorola filed its reply brief, Sherman filed a motion asking the Court to strike portions of the reply brief, including "all unsupported factual statements and new factual assertions." ECF No. 60. Motorola responded that Sherman was "mistaken" that any factual statements were either "unsupported" or "new." Briefing on the motion to strike completed on July 10, 2017.

Finding insufficient grounds to "strike," the Court will deny Sherman's motion to strike portions of Motorola's reply brief and certain supporting evidence but, alternatively, I will consider the evidence (or lack thereof) and Sherman's objections, as applicable, in the analysis of Motorola's motion for summary judgment. Furthermore, the Court concludes Sherman raises genuine issues of material fact as to whether he was constructively discharged and whether Motorola retaliated against him based on his age; however, the Court finds it lacks jurisdiction to hear Sherman's failure to promote claims. Therefore, the Court will grant in part and deny in part the motion for summary judgment, and dismiss Sherman's claims for failure to promote.

## FINDINGS OF FACT

The Court makes the following findings of fact viewed in the light most favorable to Sherman, who is the non-moving party in this matter.[1]

1.      Sherman was employed by Motorola from October 1, 1977 to April 24, 2015. At the time he left Motorola, Sherman was classified as a Senior Systems Engineer, he was sixty years old, and he was the oldest member of his engineering team.

---

[1]Unless cited, these facts are undisputed by the parties.

2.      Until 2005, Sherman served Motorola's "Territory 7," which then included Arkansas, Louisiana, Nevada, Utah, and Arizona, and he worked on large projects, both in terms of project costs and complexity, in each of those states.  Affidavit of Jeffrey D. Sherman, May 9, 2017 ("Sherman Aff.") ¶ 14.  In 2005, as part of a company reorganization, Arkansas and Louisiana were moved from Territory 7 to Territory 6, and the responsibilities of Nevada, Utah, and Arizona were given to the Phoenix engineering office.  *Id.* Thus, Sherman was no longer responsible for his territories and projects, and he was assigned to do the only projects available in Colorado, which were considered "small."  *Id.*

3.      During the relevant time period, the following individuals supervised and/or managed Sherman at Motorola:

| | | |
|---|---|---|
| Engineering Supervisor: | Phillip Raymond | 2013-2014 |
| | Larry Mabry | Jan 2015-Apr 2015 |
| | | |
| Group Supervisor: | Bruce Dykstra | 2005-May 2014 |
| | Adam Quintana | May 2014-Apr 2015 |
| | | |
| Group Lead: | Marty Davis | early 2014-Apr 2015 |
| | | |
| Engineer: | Jeffrey Sherman | |

Sherman Aff. ¶¶ 4, 6, 14; *see also* Deposition of Jeffrey D. Sherman, November 9, 2016 ("Sherman Dep.") at 39: 12–17.

4.      Mark Shaklee and Rebecca Zwang were the Motorola HR professionals who assisted in preparing a Performance Improvement Plan ("PIP") given to Sherman on April 22, 2015.  *See* April 21, 2015 Email from Quintana to Sherman, ECF No. 43-5.

5.      Marty McCoy was the "main contact" between Motorola and its customer, Wyolink, for whom Sherman performed engineering work for approximately three years between 2012 and 2015.

Sherman Aff. ¶ 6.

6.     Sherman testified at his deposition that certain of these individuals did not discriminate against him based on his layperson's understanding of age discrimination, including Phillip Raymond, Larry Mabry, Bruce Dykstra, Martin Davis, Marty McCoy, Mark Shaklee, and Rebecca Zwang. Sherman Dep. 46: 11 – 47: 13.

7.     Sherman also testified that Dykstra did nothing to cause Sherman to question Dykstra's honesty or integrity (*id.* at 77: 23 – 78: 2), and he was "one of the best managers [Sherman had] ever had" (*id.* at 360: 24 – 361: 2).

8.     Dykstra was responsible for preparing Sherman's annual performance evaluations while he was Sherman's direct supervisor, from 2005 until 2014, at which time Davis became the "Group Lead"; thereafter, Davis prepared Sherman's performance evaluation. Deposition of Bruce Dykstra, February 2, 2017 ("Dykstra Dep."), 14: 25 – 15: 4; 15: 24 – 16: 6.

9.     Sherman's overall performance rating throughout his employment was "valued performer" or "meets expectations." Sherman Dep. 162: 2–14. He consistently received annual salary increases based on merit and numerous awards for various projects he worked on, as well as recognition awards, called "high-fives," from his coworkers. Sherman Aff. ¶ 3. Until 2015, Sherman never received any written discipline of any kind during his thirty-seven years at Motorola. *Id.*

10.    Dykstra testified that Sherman was always one of the lowest-ranked engineers on his team with respect to performance (Dykstra Dep. 35: 24 – 36: 2), but stated that Sherman met the expectations Dykstra had set for him (*id.* at 89: 12–19). Dykstra explained that he "tended to be easier on people" (*id.* at 174: 5–11), and that it was his philosophy in supervising people to try to encourage them with positive reinforcement and not to focus on their performance problems (*id.* at

178: 3–13).

11.      Dykstra received complaints from Sherman's co-workers concerning Sherman's performance, including complaints from Adam Schwartz, Lisa Mansuatti, and Barb May. *Id.* at 57: 18–22; 244: 14 – 245: 13.

12.      In or about 2013 (*id.* at 180: 14–19), Dykstra traveled to Boulder for a meeting with Sherman at which he

> sat down with Jeff and said, some things have got to change here. This is not good. We can't keep going down this road. And, again, I – I didn't want to have to fire Jeff. I mean, certainly, it was always my desire, unless there were – you know, I hoped Jeff could retire from Motorola, and he did. So I was happy about that. But, yeah. That was the one circumstance that I recall that I had to take some pretty immediate action.

*Id.* at 180: 3–13.

13.      As set forth above, starting in 2014, Plaintiff reported directly to the Group Lead, Martin Davis. Sherman testified that Davis did nothing to cause Sherman to question Davis' honesty or integrity (*id.* at 77: 16–22), and when asked what type of supervisor Davis was, Sherman testified "I don't have any complaints about him." *Id.* at 361: 5–7.

14.      Davis first met Sherman in 1998 when he worked as an intern for Motorola, then again in 2000 when Davis returned to Colorado as a systems engineer. Deposition of Martin Davis, November 22, 2016 ("Davis Dep.") 11: 13–22. Based on his participation in engineering design reviews with Sherman during this period, Davis considered Sherman to be a "competent engineer." *Id.* 12: 16–22.

15.      When Davis, as Group Leader, was asked to rank the engineers he supervised "not" for use in a performance analysis, but "to figure out or to evaluate things that maybe other people had done to improve performance," he rated Sherman as the "weakest" in his group. Davis Dep. 54: 8 – 56:

12. Dykstra was also involved in preparing this ranking and confirmed that the ranking indicated nothing about whether the employees were meeting the expectations of their jobs but, rather, who was contributing the most and the least to their engineering teams. Dykstra Dep. 82: 12–25; 85: 2–6.

16. During the time Sherman reported to him, Davis received complaints from Project Managers Barb May and Steve Langworthy that Sherman "was not doing up to their standards of work." Davis Dep. 29: 4–18.

17. Davis agrees that the statement, "this project could have been done better," is an opinion rather than an indication that the engineer on the project did something wrong. *Id.* at 14: 5–11. Davis considered "many" of May's and Langworthy's complaints to be "differences of opinion." *Id.* at 29: 19–22.

18. On January 8, 2015, Davis performed the 2014 performance evaluation for Sherman at which he opined that Sherman was a competent engineer and met expectations. *Id.* 15: 1–8. On the evaluation form, Davis wrote that "Jeff was a tremendous asset for the T7 team," and he "has performed to expectations during the 2014 year." ECF No. 49-14.

19. The WyoLink project was a large project Motorola had performed for the State of Wyoming for "quite a long time." Deposition of Larry Mabry, January 31, 2017 ("Mabry Dep.") 30: 14–20.

20. Martin ("Marty") McCoy was the State of Wyoming employee in charge of the WyoLink project. Sherman Dep. 241: 22 – 242:1.

21. In 2012, Dykstra asked Sherman what he would like to work on and stated that positions on some projects were available in New Mexico. Sherman Aff. ¶ 14. Sherman asked Dykstra whether positions were available closer to Sherman's home in Lyons, Colorado, and Dykstra offered Sherman the lead engineer position for the WyoLink project in Wyoming, which was similar to the

work Sherman had been performing and was closer to Sherman's home. *Id.*; *see also* Sherman Dep. 241: 14–23.

22.     Sherman worked only on "post-sale" aspects of the WyoLink project and reported only to the Motorola Project Manager, Neil Clatworthy, not to the customer, Marty McCoy. Sherman never worked directly with McCoy. Any requests for information from McCoy were channeled through Clatworthy. Sherman never called McCoy directly, and McCoy never called Sherman. Any emails Sherman sent to McCoy went through Clatworthy first. Sherman never worked with anyone directly from the customer's side but only with Clatworthy and the Motorola shop, and he never designed anything "pre-sale" for WyoLink because it was already finished. Sherman Aff. ¶ 12.

23.     Shortly before June 2014, 30-year-old Adam Quintana became Sherman's engineering group's supervisor. At Sherman's first meeting with Quintana in June 2014, Quintana appeared to Sherman to be cold, hostile, and demeaning. *Id.* ¶ 4.

24.     At or around that same time, Sherman asked Davis, his immediate supervisor, to be removed from the WyoLink project due to McCoy's "repeated" changes to designs previously agreed-upon, which required Sherman to reproduce his work and made it appear as if Sherman had made mistakes. *Id.* ¶ 6; Davis Dep. 42: 19 – 43: 25.

25.     Davis mentioned the request to Quintana, then "started weaning [Sherman] off the WyoLink project and started bringing Rifaah [Alkhamis], the other engineer, trying to bring him up to speed and get him as the new engineer up there." Davis Dep. 45: 21–25, 46: 1–4; *see also* Quintana Dep. 82: 11–21. After Sherman's request, no new projects relating to WyoLink were assigned to Sherman. Davis Dep. 46: 22–25, 47: 1–3.

26.     In or about October 2014, Sherman told Davis that he believed Quintana was going to fire

him based on Quintana's "expectations," which were higher than those Dykstra had placed on him. Davis Dep. 31: 9–14, 32: 4–7.

27.     In late 2014, due to "problems" he had experienced with Sherman, McCoy asked Motorola to remove Sherman as lead engineer for the WyoLink Project and replace him with a different engineer.  Declaration of Martin McCoy, April 11, 2017 ("McCoy Decl.") ¶ 3, ECF No. 43-9.

28.     At no time was Sherman told by anyone at Motorola, or by McCoy on behalf of WyoLink, that there had been any issues with his performance.  Sherman Aff. ¶ 6.  Moreover, Sherman was never informed of any reason why McCoy, with whom Sherman had little, if any, direct contact, would want him removed from the project.  *Id.* at ¶12.

29.     In his estimation, Davis believed Sherman "did fine" with his work on the WyoLink Project in 2014.  Davis Dep. 70: 23–25.

30.     Throughout his career at Motorola, Sherman was aware of one other situation in which a client asked Motorola to remove an engineer from the client's project.  Sherman Dep. 242: 5–13.

31.     In a February 2015 meeting ("PM planning session"), Quintana informed Sherman that McCoy had requested he be removed from the WyoLink project.  *Id.* at 243: 16 – 244: 8.

32.     Quintana also informed Sherman during the PM planning session of "issues [he] saw with [Sherman's] performance and the feedback [he] had received from other team members." Deposition of Adam Quintana, November 18, 2016 ("Quintana Dep.") 121: 19 – 122: 9.  Quintana described Sherman's performance issues as:

> He was making the same mistakes, not keeping up with the latest and greatest technologies, just not having that engineering rigor. I talk about engineering rigor in the performance improvement plan, that's, you know, constantly challenging yourself to improve yourself, and not taking anything for granted, you know, double checking, triple checking your work before you send it out. Yeah, so I think that all kind of stems from a lack of motivation, in my opinion.

*Id.* at 123: 7–17.

33. To Davis' knowledge, Sherman was not making repeated mistakes necessitating counseling or other forms of discipline. Davis Dep. 28: 11–15. In addition, Quintana did not inform Davis that he had counseled Sherman on any problems Quintana saw. *Id.* 28: 22–25.

34. Sherman understood that the PM planning session with Quintana was to discuss "goals" for 2015; however, no goals were discussed. Rather, Quintana "wanted to know what [Sherman's] plans were for the future and when [he] planned to retire." Sherman Aff. ¶ 9. When Sherman told Quintana that he was planning to stay at Motorola for another ten years, Sherman perceived that Quintana's demeanor visibly changed and he became hostile; Quintana told Sherman that he did not know what to do with him, and that Sherman should have retired after the flood in Lyons in 2013. *Id.* Before this meeting, Quintana had never complained to Sherman about his work. *Id.*

35. Although he had decided to do so, Quintana did not inform Sherman at this PM planning session that he was going to place Sherman on a performance improvement plan ("PIP"). Quintana Dep. 137: 9–24. Quintana "didn't get a good feeling coming out of that review that [Sherman] was really taking what [Quintana] said to heart." *Id.* at 138: 1–3.

36. In or about February 2015, Cari Southerland, a market solutions specialist who lived in Colorado and who was acquainted with Quintana, called Quintana, explained that she was about to be laid off from Motorola, and asked whether he could do something to help. *Id.* 163: 1 – 165: 24. Quintana did not want to lose Southerland—"a good engineer" and "a very good person" at Motorola—to a layoff. *Id.* 164: 15 – 165:6.

37. On February 26, 2015, Paul Cizek, Motorola Director of Strategy & GTM Enablement, who was Southerland's second-line supervisor (*id.* 164: 2–6), sent an email to Quintana saying:

> I spoke to Kristen [human resources representative] regarding the situation with [Southerland] and the interest you have in a PBM position. Kristen mentioned that you may already have similar input from Mark as she was aware her team was looking into this on the HR side. Bottom line is that Kristen would not be supportive of separating someone (field pre sales engr.) who essentially is a performance issue in order to make the ability to open a headcount for [Southerland]. Kristen believes that the PIP process can effectively be accomplished in 60 days if immediately documented (focused deliverable expectations and documented assessments) and the process initiated. Kristen said that I have flexibility with [Southerland's] situation as far as timing and thus could help work this such that we don't lose the opportunity.

ECF No. 49-24. Quintana confirmed that Sherman was a considered a "field presales engineer." Quintana Dep. 167: 2–4.

38.     That same day, Quintana forwarded Cizek's email to Mabry and Shaklee saying, "My plan now is to put both Jeff Sherman and Gary Owens on [a] PIP and maybe we can do something after 60 days. I will be starting the documentation process and run it by yourself [sic] and Mark Shaklee." ECF No. 49-24. Quintana never went forward with the PIP process for Owens. Quintana Dep. 170: 17–18.

39.     Explaining his motivation behind his statement to Mabry that "maybe we can do something after 60 days," Quintana testified:

> A. So at the time of year [February 2015] we wanted to bring Cari over. We were looking for any way to bring Cari over, and my intention all along was to put Jeff and Gary on a performance improvement plan. If, for whatever reason, they did not live up to the terms of the performance improvement plan, then as I understand the process, it never got to this point, this was my first one, but that would be grounds for termination.
>
> Q. And what did that have to do with Cari Southerland?
>
> A. It would have freed up a headcount on my team.

*Id.* 171: 2–14.

40.     Southerland was transferred to Quintana's team in March 2015 before Quintana placed

Sherman on the PIP.  *Id.* 170: 14–15; *see also* ECF No. 49-22.  Mabry clarified that they "had a head count open for a PBM [Presale Business Manager], and we brought Cari Southerland over to fulfill that job, and she's still in that job to this day."  Mabry Dep. 80: 24–25, 81: 1–7.

41.     After the February 2015 PM planning session between Quintana and Sherman, Quintana excluded Sherman from meetings with other engineers and with customers, which he had typically attended.  Sherman Aff. ¶ 11.

42.     This was the first time Quintana had placed an employee on a PIP, so he was unable to answer accurately whether it was customary that a Motorola manager would have discussed at length his or her concerns with the employee's performance before placing the employee on a PIP.  Quintana Dep. 139: 7–16.

43.     Quintana testified that, during a March 2015 telephone call, Quintana informed Sherman that he was going to place Sherman on a PIP.  *Id.* at 188: 19 – 189: 17.

44.     As Group Leader, Davis "did not see any need to put [Sherman] on a performance [plan], with the information [he] had."  Davis Dep. 71: 11–16.

45.     At a meeting in Mesquite, Nevada on April 7, 2015, Sherman verbally complained to Quintana's (recently former) direct supervisor, Philip Raymond, saying, "I'm having a problem with Adam. I think it has something to do with age."  Sherman Dep. 191:7-15, 197:12-18.

46.     Although his memory was "sketchy," Raymond recalls that Sherman did approach him on April 7, 2015, saying he was concerned about Quintana's management and that he felt very pressured by Quintana.  Deposition of Philip Raymond, November 21, 2016 ("Raymond Dep.") 71: 10–23. Raymond did not remember Sherman saying where he felt such pressure was leading him, that Quintana was trying to force him to resign his employment, or whether age played a role in what

was happening to Sherman. *Id.* at 72: 18 – 73: 10. Raymond told Sherman he would talk to Quintana. *Id.* at 74: 1–4.

47.    Raymond spoke to Quintana that same day or the day after; Quintana told Raymond that he was preparing a PIP for Sherman based on Sherman's performance. *Id.* at 74: 10–23; 75: 13–19. Raymond did not believe that Sherman would have felt pressure from the PIP because "at that time, when [Raymond] was talking to Mr. Quintana, he had not prepared the PIP." *Id.* at 75: 23 – 76: 12. Raymond did not report this information back to Sherman because he "felt it was appropriate for Mr. Quintana to be the first to discuss the PIP with Mr. Sherman." Declaration of Philip Raymond, April 13, 2017 ("Raymond Decl.") ¶ 4, ECF No. 44.

48.    Sherman testified that, on or about April 17, 2015, Quintana called him to inform him that Quintana was putting Sherman on a PIP "and he set up a conference call date with HR." *Id.* at 199: 17–25, 200: 1–12. Sherman asserts this was the first time he learned about the PIP. *Id.* at 200: 13–16.

49.    Quintana "had a lot of questions" about preparing the PIP, so he "reached out to the HR team and Ken Rey, to get his input on pointers on how [he] should prepare." Quintana Dep. at 177: 1–7. The Human Resources ("HR") team consisted of Mark Shaklee and Rebecca Zwang, who assisted Quintana with preparing the PIP.

50.    On April 15, 2015, Quintana emailed a "new version" of the PIP to Zwang following her request for a "status," saying "I tried to get more specific on the measurable goals." ECF No. 49-7. Zwang replied, "This draft is much improved!" and "I've asked Mark [Shaklee] to take a look and see if he has any thoughts on making the goals more measurable." *Id.*

51.    On April 21, 2015, Zwang emailed Quintana again saying, "I haven't heard from you. What

are your plans to move forward?"  *Id.*  Quintana responded, "Ok, I cleaned a couple things up. I would like to move forward with this."  *Id.*

52.    The HR team also participated by telephone in a subsequent April 23, 2015 meeting when the PIP was delivered to Sherman.

53.    Just prior to that meeting, Sherman walked into the office of Quintana's direct supervisor, Larry Mabry, in the morning of April 23, 2015 at which time he engaged in a "fifteen-second" conversation with Mabry:

> A.    I said, Larry do you have a minute? Are you going to be part of the  – my PIP call this afternoon? And he would have said, No. I've got other things to do, or whatever.
>
> Q.    What did you say then?
>
> A.    I said, I've got a – I've got a problem with Adam. I haven't done anything wrong, and I think this has something to do with my age.
>
> Q.    And what was his response?
>
> A.    He said, Most – most problems with people are their performance, and he smiled.
>
> Q.    Okay. And was there anything further said?
>
> A.    He says, I'm sorry, I have to go.

Sherman Dep. 208: 23 – 210: 22; 211: 12–25.

54.    Mabry recalls that Sherman spoke to him for a few seconds in the morning on April 23, 2015, complaining that Quintana was "difficult to deal with," but Mabry did not recall Sherman using any "words of discrimination" or saying anything "about discrimination at all."  Mabry Dep. 144: 14 – 145: 6.

55.    As the HR team was reviewing the terms of the PIP with Sherman at the April 23, 2015

meeting, he interrupted them saying, "I can make this easy for you" and told them that he was going to resign. Sherman Dep. 316: 16–23. Sherman understood that the HR team intended to finish reviewing the terms of the PIP with him if he had not interrupted. *Id.* at 316: 24 – 317: 3.

56.    When Sherman stated that he was going to resign, Mr. Shaklee of the HR team suggested that he take some time to think about that decision. *Id.* at 14: 12 – 15: 2.

57.    The next day, Sherman signed a resignation form, stating his reason for resignation as "irreconcilable differences with management." *Id.* at 15: 3–6; 294: 2–4. Sherman did not list "age discrimination" as a reason for resignation because, at that time, he did not understand that "disparate treatment" was a form of age discrimination, which he believed was limited to "just somebody saying, 'You're too old to do this.'" *Id.* at 41: 3–8. Sherman learned about disparate treatment from his son, who is a VA benefits counselor, approximately two to three weeks after his resignation. *Id.* at 41: 9–22. Sherman understood "disparate treatment" to mean "if a younger worker is treated differently than an older worker . . . because of their age." *Id.* 43: 7–13.

58.    Sherman had been told that if he completed the tasks assigned on the PIP, his employment would continue, but his understanding was "that's not necessarily what happens" and that "the employee may be terminated regardless." *Id.* at 305, 306: 1–3.

59.    Sherman was aware that Cari Southerland had been put on a PIP in the past and, after she completed the PIP, she was still employed at Motorola as of the date of Sherman's deposition. *Id.* at 306: 4–20.

60.    Throughout his thirty-seven years with Motorola, Plaintiff was not aware of any employees who completed a PIP and were not allowed to continue in their employment with Motorola. *Id.* at 308: 3–7.

61.     Sherman never read past the first page of the copy of the PIP that was given to him at the April 23, 2015 meeting.  *Id.* at 317: 8–14.

62.     Sherman claims that Quintana gave him a draft of the PIP for him to review during the April 23, 2015 meeting, rather than the final version of the PIP.  *Compare* ECF No. 43-11 (draft) *with* ECF No. 43-12 (final); *see also* Sherman Dep. 317: 24 – 318: 5. The tasks listed in the draft PIP were different than those in the final PIP.  *Id.*

63.     Sherman admitted that it would have been easy for him to complete the tasks listed in the draft PIP that Quintana provided him.  *Id.* at 312: 12–15.  However, Sherman believed the final version, which was read to him by the HR team during the April 23, 2015 meeting, contained tasks that were

> [t]oo broad, too subjective, too time-consuming. It would have detracted from my normal workload. It was more – I think it was more beefed up to embarrass me or try to convince me to not – not to take it.

*Id.* 377: 15–24.

64.     With the exception of this lawsuit, Quintana had never been (at the time of his deposition) accused of any type of discrimination.  Quintana Dep. 14: 4–8.

65.     Sherman told former co-workers his financial advisor had indicated Sherman had enough savings to live into his 90s. *Id.* at 140: 15 – 141: 3.  He also told his former co-workers immediately following his resignation that he was "really enjoying" his life, "life after being employed was fantastic," and it was "like being a kid again, on permanent vacation." *Id.* at 141:7 – 142:4.

## MOTION TO STRIKE

The Court determines that, before addressing the motion for summary judgment, it must determine whether it should strike or decline to consider any challenged briefing or evidence.

Sherman argues that Motorola improperly asserted new facts and produced new evidence in its reply brief that was not previously addressed in its opening brief; in addition, Sherman contends that Motorola fails to support certain evidence, and it should not be considered.

First, the Court notes that Sherman cites Fed. R. Civ. P. 56(c)(2) in support of his motion to strike. However, a "Rule 56(c)(2) objection [is not] an appropriate basis for a separate motion." *Smith v. Aurora Pub. Schs.*, 318 F.R.D. 429, 431 (D. Colo. 2016); *see also Daniels v. United Parcel Serv., Inc.*, 797 F. Supp. 2d 1163, 1171–72 (D. Kan. 2011) ("stressing" that a motion to strike is improper saying, "[i]t suffices that the party objecting to summary judgment material simply state the objection with a brief description (akin to a speaking objection) and a citation to the Federal Rule or case upon which the objection is based.").

Nevertheless, because courts should "decline to consider arguments raised for the first time in a reply brief" (*Marshall v. Oliver*, 644 F. App'x 839, 840 n.1 (10th Cir. 2016)), the Court will proceed to determine whether Motorola's arguments are improperly "new."

First, Sherman challenges Motorola's argument concerning a "younger" employee, Rifah Alkhamis, who purportedly assumed Sherman's duties after his employment separation. *See* Compl. ¶ 11(h). Motorola argues in its reply brief that "when Mr. Alkhamis encountered difficulties performing his job in 2016, he was treated exactly the same as Plaintiff—he was placed on a Performance Improvement Plan." Reply 2, 5. The Court finds this argument is properly responsive to Sherman's arguments in his response brief that he was "being 'set up' to be replaced by a younger employee," saying "the company had hired 29-year-old engineer Rifaah Al Kamis approximately thirteen months before Plaintiff's resignation, and rapidly promoted him to Plaintiff's own 'E8' promotion level." Resp. 7; *see also* Resp. 16 ("Prior to Plaintiff's resignation, Motorola had already

taken steps to replace him with younger employees. Approximately 13 months prior to Plaintiff's resignation, Motorola hired Rifaah Al Kamis ("Rifaah"), who was then 29 years old". . . . and who "began doing some of the same types of work Plaintiff was doing."), 28 ("As to disparate treatment of younger employees, Plaintiff testified that his much-younger coworker Rifaah was promoted to an E8 level after only two or three years, despite not being qualified for such a promotion."). Sherman does not contest that he had no access during the discovery period to the information argued by Motorola and, thus, the Court finds no basis on which to strike Motorola's argument.

Second, Sherman challenges as "new" and "unsupported" Motorola's argument that McCoy was "in charge of the [WyoLink] project for over ten years" and "had never requested that any Motorola employee be removed from the project." Reply 7. The Court is not persuaded that Motorola's argument must be stricken, but I find that the argument deserves only minimal consideration. McCoy's affidavit, attached to the motion, provides that he was, indeed, the Support Manager for the WyoLink project from October 2006 to May 2017. ECF No. 43-9. However, the second portion of Motorola's argument arises from testimony by Larry Mabry, who had only been in the Engineering Supervisor position since January 2015. *See* Reply (citing Mabry Dep. 179:7-9, ECF No. 58-5). Thus, the Court will consider this evidence only insofar as McCoy "never" requested from Mabry, during his tenure as Engineering Supervisor, that a Motorola employee be removed from the project.

Third, Sherman contends that Motorola's exhibits 20 and 23 should be stricken "as they relate to events that occurred after Plaintiff's termination" and that exhibit 24 should be stricken as non-responsive to Sherman's argument concerning Cari Southerland, a "younger" employee "brought over to fulfill many of the duties of Plaintiff." Mot. 2. The Court finds that exhibits 20

and 23 relate to Alkamis and, as set forth above, are properly responsive to Sherman's arguments. Concerning exhibit 24, the Court notes Sherman's objection and will consider it in the Court's analysis of the motion for summary judgment.

Fourth, Sherman challenges as "unsupported by the record" Motorola's contentions that he "only read the first page of the three-page PIP document" and McCoy "directed Motorola to remove Plaintiff from the WyoLink project because of 'problems' with Plaintiff's performance." Mot. 3. The Court disagrees in part. The record demonstrates that Sherman testified at his deposition, "Actually I never read past the first page, to be honest with you. I didn't read the entire document." Sherman Dep. 317: 12–14. However, the Court agrees that the record provided here does not necessarily support an argument that McCoy asked to remove Sherman from the WyoLink project due to "performance" problems. *See* McCoy Decl. ¶ 3 ("Because of problems that I was experiencing with Jeff Sherman in the later part of 2014, I asked Motorola to remove Mr. Sherman as lead engineer for the WyoLink project"); Mabry Dep. 26: 24–25, 27: 1–12 ("he [McCoy] just thought it was very difficult to work with Jeff."); Mabry Dep. 179: 20–25, 180: 1–3 (stating that McCoy indicated Sherman was "confrontational" with McCoy); Quintana Dep. 76: 14–25 (indicating that Jose Crespo, Wyoming Account Manager, and Ken Rey, Area Sales Manager, told him McCoy wanted Sherman removed from the WyoLink project, but stating he did not recall the reason given). The Court will note Sherman's objection and, as with other arguments and evidence, the Court will provide the consideration it deserves during its analysis of the motion for summary judgment.

## MOTION FOR SUMMARY JUDGMENT

A motion for summary judgment serves the purpose of testing whether a trial is required.

*Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the Court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Only admissible evidence may be considered when ruling on a motion for summary judgment. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

The non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, if the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original) (citation omitted); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule

56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008

(10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence

must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the

Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must

be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir.

2005). "The court views the record and draws all inferences in the light most favorable to the non-

moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255

(10th Cir. 2005).

## I. ANALYSIS

Motorola seeks summary judgment in its favor on Sherman's claims under the Age

Discrimination in Employment Act ("ADEA") and the Colorado Anti-Discrimination Act

("CADA") for disparate treatment based on a "constructive discharge," retaliation, and a failure to

promote.[2] The Court will address each claim to determine whether Sherman raises genuine issues

of material fact which must be heard by a jury.

_____

[2]Sherman also asserts claims under these statutes for a "hostile work environment."
Compl. ¶¶ 18(b), 22. *See MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1277 (10th Cir.
2005) (recognizing hostile work environment as an adverse action under the ADEA); *Horodyskyj
v. Karanian*, 32 P.3d 470, 479 (Colo. 2001) ("The Colorado Anti-Discrimination Act makes it a
discriminatory or unfair labor practice for an employer 'to refuse to hire, to discharge, to
promote or demote, *to harass during the course of employment*, or to discriminate in matters of
compensation against any person otherwise qualified because of disability, race, creed, color,
sex, *age*, national origin, or ancestry.'") (emphasis added). Motorola does not address these
claims in its motion and, thus, the claims for hostile work environment will proceed to
adjudication by the factfinder. In addition, although the Complaint may be reasonably construed
as raising a claim for disparate treatment in placing Sherman on the PIP (Compl. ¶ 18(d); *see
also MacKenzie*, 414 F.3d at 1277 (addressing discipline as an adverse action)), Sherman's
allegations appear to characterize this purported discipline as an "intolerable condition" leading
to Sherman's alleged constructive discharge, as well as an adverse action taken in retaliation for
complaints of age bias (*see infra*).

## A.        Constructive Discharge Claim

The ADEA provides, in relevant part, that "[i]t shall be unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (citing 29 U.S.C. § 623(a)(1)). Thus, for his disparate treatment claim against Motorola, Sherman has the burden to prove that age was the "but-for" cause of the challenged adverse decision. *Id.*; *see also Ky. Retirement Sys. v. E.E.O.C.*, 554 U.S. 135, 141 (2008) ("where, as here, a plaintiff claims age-related 'disparate treatment' (*i.e., intentional* discrimination 'because of ... age') the plaintiff must prove that age "*actually motivated* the employer's decision.") (emphasis in original).

To establish a disparate treatment claim under the ADEA, Sherman must set forth a *prima facie* case of discrimination. *MacKenzie*, 414 F.3d at 1277. "Specifically, the requirements of a *prima facie* claim of disparate treatment require a plaintiff to produce evidence at a minimum establishing (1) she was a member of a protected class, (2) she was disciplined [or, otherwise, suffered an adverse employment action], and (3) she was treated differently than similarly-situated non-protected employees for the same or similar conduct." *Id.* "Individuals are considered 'similarly-situated' when they (1) have dealt with the same supervisor; (2) were subjected to the same work standards; and (3) had engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.*

Motorola does not contest that Sherman, 60 years old at the time of his employment separation, is a member of a protected class under the ADEA. However, the company argues that

Sherman cannot demonstrate material issues of fact as to whether Sherman suffered the adverse employment action of "constructive discharge."

Constructive discharge occurs when an employer deliberately makes or allows the employee's working conditions to become so intolerable that the employee has no other choice but to quit.[3] *Id.* at 1281. Sherman contends that age motivated Motorola's actions that amounted to "intolerable conditions" under which he felt forced to resign. Motorola counters that the facts fail to demonstrate Sherman had "no other choice but to quit."

"The existence of constructive discharge is an issue of fact to be resolved by the jury, and judgment as a matter of law is only appropriate if the evidence is susceptible to but one interpretation." *Strickland v. United Parcel Serv., Inc.*, 555 F.3d 1224, 1229 (10th Cir. 2009) (a court errs in granting judgment as a matter of law when evidence may be interpreted by a reasonable jury in the plaintiff's favor). The plaintiff's burden to demonstrate constructive discharge is substantial, but "whether the conditions at [the workplace] were objectively intolerable is a question of fact for the jury." *Id.*

Here, as in *Strickland*, the evidence demonstrates issues of material fact as to whether Sherman believed his job was in jeopardy, he was repeatedly told his performance was unacceptable, the PIP was changed "at the last minute" to contain requirements that Sherman believed constituted

---

[3]The issue is not currently raised or argued before the Court, but the Tenth Circuit recognizes a "compound hostile-environment constructive discharge claim," which "entails something more than conduct that amounts to actionable harassment." *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 961 (10th Cir. 2012). In other words, when a plaintiff claims that a hostile work environment culminates in a constructive discharge, he or she "must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Id.* In such case, "an employer is strictly liable for supervisor harassment that culminates in a tangible employment action," and a constructive discharge that is precipitated by an official act qualifies as a tangible employment action. *Id.* (citation omitted).

a deliberate attempt to set him up to fail, and he tried to improve his situation by requesting to be taken off the WyoLink project. *See id.* Of course, Motorola presents its own evidence to rebut Sherman's contentions, but such evidence serves only to raise material factual issues. For example, Sherman testified that after the February 2015 meeting with Quintana, during which he learned that the customer asked that he be removed from the WyoLink project, Sherman believed Quintana treated him more harshly when he informed Quintana that he had no plans to retire and later told his direct supervisor that Quintana "was going to fire" him. Motorola counters that the PIP was fully justified by Sherman's performance issues, including customer and co-worker complaints, the HR team urged Sherman to take time to consider his decision to resign, and had Sherman simply performed the requirements of the PIP, he would have stayed employed at Motorola.

The Court finds the evidence in this case is susceptible to more than one interpretation. Accordingly, a jury must determine whether the conduct alleged, including that by Sherman and his managers, contributed to create a work environment so intolerable that a reasonable person would have felt compelled to resign.

In addition, Motorola contends that Sherman fails to meet the third prong of his *prima facie* case saying, "Plaintiff has identified no evidence that Quintana treated similarly situated younger employees differently than Plaintiff." Reply, ¶ 11. First, the Court finds that Motorola improperly raises this argument, concerning a necessary element on which Sherman has the burden of proof, for the first time in its reply brief. *See Marshall*, 644 F. App'x at 840 n.1 (courts should "decline to consider arguments raised for the first time in a reply brief"). Therefore, the Court's decision not to consider this argument is fully supported. Even if the Court were to consider Motorola's argument, however, the Court finds the evidence reflects Sherman's unrebutted testimony that a 29-

year-old engineer, Rifaah Al Kamis, was also under the supervision of Quintana and performed the same or similar duties. Sherman contends Al Kamis was treated better than him in that Motorola gave Al Kamis projects for WyoLink and took steps to "replace" him with Al Kamis. The Court finds this evidence, although not fully developed and argued here, is sufficient to raise an issue of material fact as to whether Sherman was treated differently than similarly-situated non-protected employees for the same or similar conduct.

The Court will deny Motorola's motion as to Sherman's claim that he was constructively discharged based on his age.

### B.    Retaliation Claim

As with his discrimination claim, Sherman does not present direct evidence that age motivated Motorola's alleged retaliation. Thus, for his *prima facie* case, Sherman must prove that: "(1) he or she engaged in protected opposition to discrimination, (2) a reasonable employee would have considered the challenged employment action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action." *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202 (10th Cir. 2008); *see also Mathews v. Denver Newspaper Agency, LLP*, 649 F.3d 1199, 1210 (10th Cir. 2011).

Sherman alleges he complained about Quintana's purported age bias to Raymond on April 7, 2015 and to Mabry on April 23, 2015, the same day as the PIP meeting. Sherman asserts that the most recent changes to the PIP containing requirements he could not meet were added in retaliation for his complaints of age discrimination. Motorola contends Sherman presents no genuine issues of material fact demonstrating the necessary causation prong of his claim.

The facts, viewed in the light most favorable to Sherman, reflect Quintana's testimony that

he determined at or after the February 2015 meeting with Sherman to place him on a PIP. Motorola has produced a copy of a PIP for Sherman drafted by Quintana with a "plan begin date" of March 27, 2015. ECF No. 43-10. The Court finds this unrebutted evidence demonstrates Quintana made the decision to place Sherman on a PIP *before* Sherman complained about age discrimination in April 2015 and, thus, the decision to place Sherman on a PIP cannot serve as a basis for Sherman's retaliation claim.

However, Sherman asserts that Quintana's decision to modify the PIP to make the requirements more difficult to achieve and "set up [Sherman] to fail" was done in retaliation for Sherman's complaints of age bias. Motorola counters that Quintana changed the PIP merely in response to the HR team's suggestion to ensure the performance requirements could be fairly measured.

The Court finds first that a reasonable employee may consider materially adverse the preparation and imposition of a PIP containing performance requirements that the preparer knows would be difficult, if not impossible, to achieve with the intent that the employee eventually resign or be terminated.

Second, the evidence shows that Sherman complained about Quintana to Raymond on April 7, 2015 and to Mabry on April 23, 2015. Sherman attests that he mentioned to both Raymond and Mabry his belief that Quintana's negative conduct was motivated by Sherman's age; Raymond and Mabry attest that they do not recall any mention of "age" or "discrimination" by Sherman. This evidence raises a genuine issue of material fact as to whether Sherman engaged in protected conduct by complaining to Motorola management about age discrimination.

Next, the evidence demonstrates that Quintana prepared at least two versions of a PIP for

Sherman; one on or before March 27, 2015 (ECF No. 43-10) and the other on or before April 22, 2015 (ECF No. 43-12). Raymond testified that he spoke to Quintana "the same day or day after" Sherman's April 7, 2015 complaint about Quintana's management. Raymond Dep. 74: 10–23; 75: 13–19. Sherman testified that he could "easily" perform the tasks listed on the March 27, 2015 "draft" PIP, but the tasks listed on the April 22, 2015 "final" PIP were "[t]oo broad, too subjective, too time-consuming" and "would have detracted from my normal workload." Sherman Dep. 377: 15–24.

The Tenth Circuit has approved a two-to-three-week period as sufficient to infer the existence of a causal connection. *See Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (holding that twenty-four days is sufficient to infer the existence of a causal connection); *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008) ("less than two weeks . . . is alone sufficient to establish a causal connection between [plaintiff's] protected activity and [the adverse action]"). With this in mind, the Court finds that a reasonable juror, who believes Sherman's testimony, could conclude that Quintana retaliated against Sherman based on his age bias complaint by inflating the task requirements in the final PIP in an attempt to "set up" Sherman to fail or induce him to resign. Although Motorola argues Quintana modified the PIP based on suggestions by HR and the evidence includes an email chain between Quintana and HR representative, Zwang, regarding Quintana's drafting of the PIP, there is nothing contained in this email chain demonstrating that Quintana changed the draft(s) or wrote the final PIP based on particular suggestions by HR or by anyone else. In fact, the only "suggestion" referenced in the email chain is that Quintana "mak[e] the goals more measurable." ECF No. 49-7. Quintana's last message to HR included an attached "PIP document" and stated, "Ok, I cleaned a couple of things

up. I would like to move forward with this." (ECF No. 49-7) and the PIP meeting was held two days later.

Raymond spoke to Quintana about Sherman's complaint on April 7 or 8, 2015; two weeks later, Quintana prepared his final version of the PIP and sent a copy to HR. Sherman raises genuine issues of material fact as to whether he suffered retaliation based on his age. Motorola's argument that Sherman could not have suffered an injury because Quintana erroneously provided Sherman a copy of the "draft" PIP at the meeting, which Sherman attested would have been "easy" to complete, only raises additional factual issues, since Sherman also testified that he paid little attention to the "draft" PIP and listened instead to what the HR team was reading over the telephone. Sherman Dep. 325: 16–22.

The Court will deny Motorola's motion as to the ADEA retaliation claim.

## C.      Failure to Promote

In his Complaint, Sherman alleges:

> Plaintiff's position at Motorola, for the 14 years preceding his constructive termination was classified as E8, and during that period of time he received no promotions to a higher classification, despite his exemplary record. In the years leading to his constructive discharge a number of newly hired younger employees, with less experience and qualifications than Sherman, were promoted to E8, and subsequently to higher classifications.

Compl. ¶ 11(a). Motorola first contends that the claim must be dismissed because Sherman failed to raise it in his charge of discrimination filed with the Equal Employment Opportunity Commission ("EEOC") via the Colorado Civil Rights Division ("CCRD"). Sherman does not respond to Motorola's contention.

A plaintiff's exhaustion of his or her administrative remedies is a jurisdictional prerequisite to suit under the ADEA. *Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1317 (10th Cir. 2005).

Exhaustion includes the requirement that "a plaintiff normally may not bring [an ADEA] action based upon claims that were not part of a timely-filed EEOC charge for which the plaintiff has received a right-to-sue letter." *Foster v. Ruhrpumpen, Inc.*, 365 F.3d 1191, 1195 (10th Cir. 2004) (citing *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999)). The Tenth Circuit "liberally construe[s] charges of age discrimination filed with the EEOC." *Id.* "EEOC regulations explicitly state that 'a charge is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to *describe generally the action or practices complained of.*'" *Id.* (citing 29 C.F.R. § 1601.12(b)) (emphasis in original).

Here, Sherman's EEOC/CCRD charge provides the following as his "Discrimination Statement":

> I believe I was unlawfully discriminated against because of my age in violation of the Colorado Anti-Discrimination Act (CADA): (I) I was hired by the Respondent on or about October 1, 1977, and at all times satisfactorily performed the duties of my position, received positive performance reviews and merit increases. (2) In June 2014, a new person, approximate age 29, was hired as my Manager. (3) In December 2014, I received a positive performance review from my Group Leader. (4) In February 2015, I received a negative performance review from the new Manager. (5) Commencing in June 2014, the new Manager made comments questioning the reason I was still at Grade E08. (6) He also made comments that no one wanted to work with me, no one liked me, I was "lazy" and "you do not belong here." (7) The new Manager so [sic] complained to me that I was not performing projects commensurate with my experience, yet, he assigned projects. (8) As the result of the negative performance review, I was placed on a Performance Review. (9) Though I complained of the treatment to other officials, no action was taken to address the Manager's behavior and treatment of me. (10) The Respondent has a pattern of offering "buy outs" to the older employees who are in Grade E10 or higher that they want to get rid of; however, such "buy outs" are not offered to employees in lower grades and instead those employees are harassed into leaving. (11) Based on information and belief, this Manager harassed other older employees but he did not harass younger employees. (12) Because the working environment had become intolerable, I felt that I had no other choice but to resign.

ECF No. 43-19. The Court finds that although the charge may be construed (even liberally) as complaining of disparate treatment, hostile work environment, constructive discharge, and retaliation, the charge does not contain a complaint that Motorola failed to promote Sherman, particularly one consistent with the allegations set forth in Sherman's Complaint.

Accordingly, the Court concludes Sherman failed to exhaust his administrative remedies with respect to his failure to promote claim and, thus, the Court lacks jurisdiction to hear such claim. The Court will grant Motorola's motion for summary judgment in its favor on Sherman's failure to promote claim.

## II.   CONCLUSION

In sum, the Court finds Sherman raised material factual issues as to whether Motorola constructively discharged him from employment and retaliated against him by increasing PIP task requirements after he made purported complaints of age bias to management. However, Sherman raised no issues of material fact as to whether he exhausted his administrative remedies for his failure to promote claims and, thus, the Court will enter summary judgment in Motorola's favor on the claims.

In addition, Sherman has failed to demonstrate any basis on which to strike portions of Motorola's reply brief and did not provide a proposed surreply brief for the Court's consideration. However, the Court considered, alternatively and in part, Sherman's objections in its analysis of the motion for summary judgment.

THEREFORE, Defendant's Motion for Summary Judgment [filed April 12, 2017; ECF No. 43] is **granted in part and denied in part**, and Plaintiff's Motion to Strike Portions of Defendant's Reply in Support of Defendant's Motion for Summary Judgment, or in the Alternative, for Leave

to File Surreply [filed June 19, 2017; ECF No. 60] is **granted in part and denied in part** as set forth herein. Sherman's claims for failure to promote in violation of the ADEA and/or CADA are dismissed.

Dated at Denver, Colorado, this 16th day of August, 2017.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge